## DRAKE v. THYNG.

1.  PARTNERS :   *Power of partner  to sell partnership business.*
    Though a partner may sell a part  or the  whole of any of the effects of the firm which are intended for sale, and if the sale be within the scope of the  partnership business, yet he cannot without the consent of the other partners dispose of the partnership business itself, nor of all the effects, including the means of carrying it on. This is without the range of his implied powers, and contrary to the objects and designs of the association.

2.  SAME :   *Fraudulent  sale of whole effects by one partner.   Trust.*
    When a partner in the absence of his co-partner who has furnished the capital, sells the partnership effects and business at a sacrifice,

Drake v. Thyng.

to parties having knowledge of the interest of the co-partner, and when there is no necessity for the sale, a constructive trust will attach to the property in the hands of the purchasers, and as trustees they and the vendor will be held to a rigid accountability to the co-partner.

3. ATTORNEY'S FEES: *Receiver cannot pay.*

A receiver cannot claim credit in his account for attorney's fees paid by him for either of the partners; but if upon final settlement of accounts there be sufficient funds in court, belonging to the party for whom he has paid, the court may allow him to be reimbursed out of them.

APPEAL from *Sebastian* Circuit Court in Chancery.
Hon. JAMES A. YANTES, Special Judge.

*Clendenning & Sandels,*
*Duval & Cravens,*  } for appellant.

The sale was a fraud, and the decree should so have declared.

The whole proceedings by which the Court required the receiver to pass his accounts after they had been fully adjusted, was *coram non judice.*

The testimony wholly fails to support either the master's report or the decree.   The theory upon which plaintiff filed her bill was correct.   Many of the amounts allowed are shown to have been for obligations that Tinker had no right to incur.

EAKIN, J.   It is now a well settled doctrine in the law of partnership, that, whilst one partner may sell a part or the whole of any of the effects of the firm, which are intended for sale, and if the sale be within the scope of the partnership business, yet he cannot, without the consent of the other partners, dispose of the business itself; nor of all the effects including the means necessary to carry it on.   This is not fairly within the range of his implied powers; and is

1. PART-
NERS:
Power of
partner to
sell part-
nership
business.

contrary to the objects and designs of association. This is specially the case where the partnership is for a fixed term unexpired. See the rule stated in "*Parsons on Partnership*," *p.* 162.

In the case of *Rodgers* v. *Batcheler*, 12 *Peters*, 221, Mr. JUSTICE STORY delivering the opinion, announces this principle in clear and emphatic language. He says: "The implied authority of each partner to dispose of the partnership funds, strictly and rightfully, extends only to the business and transactions of the partnership itself; and any disposition of those funds by any partner, beyond such purposes, is an excess of his authority as partner, and a misappropriation of those funds, for which the partner is responsible to the partnership; though in case of bona fide purchasers, without notice, for a valuable consideration, the partnership may be bound by such acts. Whatever acts, therefore, are done by any partner (in regard to partnership property or contract) beyond the scope and objects of the partnership, must, in general, in order to bind the partnership, be derived from some further authority, express or implied, conferred upon such partner, beyond that resulting from his character as partner. Such is the general principle; and, in our judgment, it is founded in good sense and reason. One man ought not to be permitted to dispose of the property, or to bind the rights of another, unless the latter has authorized the act."

This is not a case of an assignment of the stock in trade for the payment of debts, as to which power there is much conflict of opinion. The cases on that point have no application.

The nature of this case will more clearly appear from a recapitulation of the principal facts. Drake & Thyng, in March, 1879, formed an equal partnership for brick making, to last until the first of January following. They leased

a lot from defendant, Hare, for $100. Drake, the complainant, put in almost all the cash capital; he says $2,000; the defendants admit $1,200. If Thyng put in anything, it was very little, and the amount is not shown; Thyng managed the business. Tinker was an employee of the firm, doing divers duties as foreman, book keeper, &c.

Hare, the landlord, had it seems, a store convenient, from which he sold goods, whisky, &c., to the hands, and furnished supplies of various kinds to the firm. His claim on account, including rent, amounted to $536. Tinker's claim for services, at $100 a month, amounted to $358—in all, $894. There were brick in the kilns of two or more hundred thousand, and others in the yard, unfinished. Thyng and Tinker were old acquaintances in Mississippi, and had come to Arkansas together a short time before the partnership had been formed. In this state of affairs, well known throughout by Hare and Tinker, Thyng, in the temporary absence of Drake, early in August, made in his own individual name, a sale to them of the whole brick yard, the brick on hand, burned and unburned, the lumber, wood for burning brick, and the lease itself, together with all the tools on hand for brick making, and a horse. The expressed consideration for the purchase was $2,000, but no cash was paid, or only an insignificant amount. The two accounts above mentioned were credited, and the balance was to be paid out of future sales of brick. Upon Drake's return he found defendants Hare and Tinker in possession, selling off the brick, who set him at defiance and refused to cancel the contract. He immediately brought this suit in August, 1861, obtained an interlocutory injunction, and had a receiver appointed.

Whatever may have been the intention of the parties, or whatever may have been their mistaken ideas of their rights, Hare and Tinker must have been conscious that they were dealing in antagonism to the rights of Drake, who had en-

2. SAME: Fraudulent sale of whole effects by one partner.

tered into the partnership for a fixed term, and· furnished the capital, and who had the right not only to have the assets retained for the partnership debts, but to have the partnership continued during the term.  No necessity for the sale was apparent.  Suppose the firm had in fact owed the two debts of something near $900, about which we here express no opinion, there was a large amount of bricks on hand for sale, and others making, and it does not appear that the debts would not have been paid in due course of business.  Why break up Drake by sweeping the partnership from under his feet, leaving the other debts unprovided for, and the whole property gone which his especial capital had created?  Why not wait a few days for Drake's return ?  What was the pressure for instantaneous action? To allow Hare or Tinker to take any advantage from such a transaction, would be gross and palpable injustice.  A constructive trust attached to the property in their hands ; and as trustees, they, as well as Thyng, should be held to a rigid accountability.  Drake appears to be the only innocent one, amongst all the parties.

The want of a full recognition of Drake's equities, rendered the first decree of Nov. 7th, 1870, not erroneous as far as it went, but lame and imperfect.  An utter disregard of them by a different chancellor in the subsequent decree, pours a stream of error through all the subsequent proceedings based upon it.

Upon the first hearing, the court simply decreed a dissolution between complainant and Thyng, from the second day of August, 1869, upon the ground that the latter had violated the articles, by transcending his power, and an account was ordered between them as partners.  This fell far short of the justice of the case as revealed by the pleadings and exhibits.  The sale should have been cancelled and the purchasers should have been declared trustees, and made to

account for all that had come into their hands, to be held as assets of the firm. This was necessary to a complete disposition of the equities of all parties, and a Chancellor should decline to do justice by piece-meal, except as to matters which may be conveniently separated and reserved. There was a prayer for general relief; and no settlement could be made nor account stated of the partnership, without recovering as assets the property which had passed to Hare and Tinker, or ascertaining the extent of their accountability for their interferance.

Under this decree the receiver reported his receipts and expenditures, and the special master, to whom the partnership accounts had been referred, adopted the receiver's report, showing balance in receiver's hands of $201.10. This seems to have been done in Oct. 1871. In 1872, (Dec. 7th) the defendants came in and excepted to both reports, which were in fact the same, and there the matter rested for more than five years.

On the fifteenth of January, 1878, the court, under another Chancellor, sustained the exceptions which had been made, solely on the ground that the receiver had exceeded his authority in paying debts of Thyng and Drake, for the reason that the proceeds of the property belonged to defendants. No other objection had been made to the receiver's report, as adopted and incorporated with the report of the special master. This was an error based upon the idea that the sale to defendants was good and carried the effects free of the debts of the former firm. If the sale had been declared void on the first hearing, the error might not have arisen.

The cause was again heard on the eighteenth of February, 1878, on the pleadings and evidence which, besides the matters before the Chancellor at the first hearing, included the deposition of defendant Hare himself, which invites com-

ment. He says the consideration for the purchase was $2000, made up of about nine hundred and ninety-five dollars, of which $536.84 was due to himself, and $358.08 due Joseph Tinker. The balance, of a little over $1000, he says, they were to pay *to Thyng* from the proceeds arising from the sale of brick, "then on hand." It is to be observed that the sum of the two debts fall something short of nine hundred dollars, and the *balance* would be slightly over $1000. It seems unaccountable too, that there was a necessity for selling out the whole concern to settle a debt of $900, when the brick on hand, and which Thyng might have sold in due course of trade, were expected to bring over a thousand, and Thyng, himself, relied upon them for payment. He says that the trade was made with Thyng alone at deponent's own house, Thyng having his attorney with him. He exhibits twenty-eight vouchers to sustain his accounts ; of these the 1st, 2d, 3d, 4th, 12th, 21st, appear on their face to be private orders of Thyng, signed for him by Tinker, without any showing that they were on partnership account. The 17th, 18th, and 22d, are signed by Tinker in his own name, without any allusion to the partnership. Many of the other orders are signed "Thyng & Drake, by Tinker," showing that there was intended to be a distinction between partnership and private orders. Another item consists of Tinker's board bill and sundries, charged to Thyng & Drake, $18.00, without any evidence of authority from the firm. Another item is for "refreshments, etc., supplied to brick yard hands up to June 5th, 1869," amounting to $24.00. The nature of the refreshments is not given, but there might well be a question whether they were necessary for brick making. These refreshments are stated to be "during the months of June and July, 1869." There is another charge of "refreshments" supplied the yard from June 6th, 1869, to July 31st, 1869, $37.90,

embracing the same time.   The rent for the lease is charged: in, and other items for board of hands, whisky, tobacco, etc. Such is the nature of the items which go to make up his claim against the firm of Thyng & Drake, for which he and Tinker had, in part, bought the property from Thyng, without the knowledge or consent of the only partner who seems to have had any substantial interest in it.   It was a debt which he himself says Drake absolutely denied to be valid as soon as he was informed of it.   There is nothing in his deposition to show that the articles were furnished, or the charges made on the authority of the firm.   Nothing to show that the firm agreed to pay for board of Tinker or the hands, or for any sort of refreshments.   Whether it did or not is left uncertain.

Tinker's account was made up wholly, it seems, for services in the brick-yard, as foreman and book-keeper, at $100 a month.   The value of the services were not found. *at the hearing.*

Hare says, further, that no money at all was paid at the time, except $25 paid to Thyng's attorney ; and that he agreed, as a part of the balance on the purchase, to pay said attorney $200 more.   He also says that out of the balance he was to pay $100 to Edmond Murphy, and did pay it in board, without any explanation of the nature of Murphy's claim.   Out of the balance, also, he says he paid to Mr. Thyng about $125, in " board, money, and any thing I had that he wanted."   He winds up by saying that he knew that Drake was Thyng's partner, and it was so understood by everybody.

Upon the showing made by the pleadings and this evidence, the Special Chancellor found that the sale to Hare and Tinker was *not* fraudulent and void, " but on the contrary, was made and executed in good faith, and for a sufficient and valuable consideration."   Hare and Tinker were *dis-*

Drake v. Thyng.

*missed*, to go hence without day, with their costs, and the injunction against them was dissolved. The cause, however, was retained as to the Receiver, to compel a settlement and payment to Hare and Tinker, of the amount found in his hands. The cause proceeded afterwards for that purpose. With regard to all these proceedings for compelling an account with the Receiver, it is useless to say more than that they stand or fall with the decree upon which they are based.

With regard to the decree itself, of the eighteenth February, 1878, let it suffice to say it was founded either upon a mistaken view of the law, or a strange misconception of the facts. It is erroneous and must be reversed, with all the subsequent proceedings. The purchasers should have been held as trustees, subject to a strict accountability.

3. ATTOR-NEY'S FEES: Receiver can not pay.

As touching the Receiver, it appears that he made out and filed his account in the year 1871, and that it was excepted to, " because the Receiver had exceeded his authority in paying debts of Thyng & Drake; because the proceeds arising from the sale are the property of defendants."

The exception was not, in itself, tenable. It was not pressed until 1878, when it was sustained by the Chancellor. This was error. The assets belonged to the firm of Thyng & Drake, and had been properly applied to the payment of their debts. It would be unjust now, after such a lapse of time, and was so in 1878, to hold him to another and stricter account, when the memory of events may have escaped his mind. There were some apparent errors in it, however, which the court, on its own motion. should correct; and as to the rest, let it stand. The Receiver had no authority to credit himself with attorney's fees paid to either party, or in their behalf. He must look for reimbursement to the parties themselves, and if on the final settlement of accounts there be sufficient funds in court, belonging to the parties

Drake v. Thyng.

for whom he has paid, the court may allow him out of their respective shares, if the advances of fees have been proper and reasonable; or were made at the request of the party charged. So far as there may be a fund in court, the Receiver, under the circumstances, may well be subrogated to the lien which an attorney might have claimed upon his clients shares.

## DIRECTIONS FOR A DECREE.

Let the order of the court of the fifteenth of January, 1878, sustaining the exceptions to the Receiver's report be reversed and set aside; also the decree of the court of the eighteenth of February, 1878, and all subsequent proceedings.

Remand the cause, with directions to the court below to correct the said report and account of the Receiver as to the credit for counsel fees, and confirm as to the rest, in accordance with this opinion.

With further directions to the court to enter a decree declaring the sale by Thyng to Hare and Tinker, fraudulent and void, and that they be held as trustees of the firm of Thyng & Drake, for all the property received by them under said sale; whether sold, wasted, or otherwise lost or disposed of before the property passed into the hands of the Receiver; against which they may be credited for all necessary and proper expenses regarding said property.

With further directions to order an account to be taken between the firm of Thyng & Drake, and said trustees; and that all balance found against them be considered and treated as the assets of the firm of Thyng & Drake, and that upon their failure to pay the same into court, execution issue therefor.

With further directions to order an account of the partnership affairs between Thyng & Drake, and that the assets

of the firm, including balances in the hands of the Receiver, and of Hare and Tinker, as trustees, be first applied to outstanding debts of the firm, next to adjustment of any balance due either partner from the firm, on account of partnership transactions; or if there be no balance, that the court enter a personal decree in favor of either partner against the other, for adjustment and equality.

And with further directions to remit said Hare and Tinker to their respective claims against the firm upon their accounts, the true amounts to be ascertained by proof.

And for such other and further proceedings as may be necessary to adjust the rights of all parties, concerning the subject matters in controversy, according to the principles and practice in equity, and those announced in this opinion.

A decree by default, for want of appearance, against Thyng, should be entered, that he may be held amenable for such share of the costs as the Chancellor may deem meet to impose.